1
2
3
4
5
6
7
8                  IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   RACHELL N SAENZ,                    No    C 07-5102 VRW

12          Plaintiff,                         ORDER

13          v

14   MICHAEL J ASTRUE,
     Commissioner of Social Security,
15
            Defendant.
16   _____/

17

18          Plaintiff Rachell N Saenz appeals the final decision of

19   the Social Security Administration (SSA) to deny her applications

20   for disabled adult child benefits under Title II and supplemental

21   security income —— SSI —— under Title XVI.

22          In her motion for summary judgment, plaintiff argues four

23   issues:  (1) the administrative law judge (ALJ) improperly denied

24   plaintiff due process by failing to follow SSA procedures relating

25   to the introduction of new evidence and failing to notify plaintiff

26   of her rights regarding that evidence; (2) the ALJ improperly

27   discounted evidence from plaintiff's treating physician favorable

28   to her application; (3) the ALJ's finding that plaintiff's disease

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

was in "remission" and that she had "completely recovered" was not supported by substantial evidence; and (4) the ALJ improperly determined plaintiff's credibility to be poor.  Doc #13 at 7-8, 9-10, 8-9, 10-12.

Defendant Michael J Astrue specifically rebuts each of these points in his cross motion for summary judgment.  Doc #14. After reviewing the record, the court agrees with defendant and affirms the SSA's decision.


I

A

Plaintiff was born on June 20, 1986.  Doc #12, Administrative Record at (AR) 17.  In late 2000, plaintiff began suffering from persistent phlegm-producing coughs.  AR 251.  During this time, plaintiff lived around multiple pets and farm animals, was regularly exposed to fumes and smoke from a wood-burning stove and kerosene heater, and began smoking several cigarettes a day. AR 214, 218, 251.  During 2000 and 2001, plaintiff's coughing increased, she began losing weight and she began missing school due to fatigue and shortness of breath.  AR 221-22.

On May 3, 2001, plaintiff sought medical care from her local medical center for back pain and shortness of breath.  AR 221.  After an abnormal chest x-ray, which showed "diffuse interstitial pneumonitis," plaintiff was transferred immediately to University of California Davis Medical Center where she underwent numerous tests during her four-day stay.  AR 221.

Over the next few months, plaintiff's treating physician John E Hodgkin, MD, a pulmonary and critical care specialist,

2

United States District Court
For the Northern District of California

referred plaintiff to other specialists for more examinations and tests.  AR 244.  In July 2001, a pulmonary specialist performed a spirogram on plaintiff and measured her forced vital capacity (FVC) at 1.06 liters and her forced expiratory volume (FEV) at .87 liters.  AR 267.  FVC measures the volume one is able to exhale in total, while FEV measures the volume one is able to exhale in one second.  Plaintiff's FVC and FEV were 36% and 33%, respectively, of the predicted volumes considering her height of sixty inches and weight of ninety-four pounds.  Id.

Also in July 2001, a cardiologist observed plaintiff's heart to be functioning "normal[ly]", but found her "right ventricle and pulmonary artery [] in the upper range of normal" and found "mild thickening of the pulmonary valve leaflets."  AR 265.  In August, a lung biopsy revealed that plaintiff had Langerhans' Cell Histocytosis (LCH), a rare pulmonary disease which the doctor conducting the biopsy believed was at least partially caused by plaintiff's smoking.  AR 253.  That doctor "strongly urged [plaintiff] to discontinue smoking," id, advice that she eventually followed.  AR 325.

In August 2001, plaintiff informed Dr Hodgkin that she was "considering not going to school because of the high prevalence of kids that smoke."  AR 248.  In a September 4, 2001 letter to plaintiff's school, Dr Hodgkin advised that "patient not attend school where she could potentially be exposed to cigarette smoke as well as respiratory infections."  AR 244.

On September 20, 2001, a pediatric pulmonary specialist at the University of California San Francisco (UCSF) measured plaintiff's FVC at 1.20 liters or 45% of the predicted volume and

United States District Court

For the Northern District of California

1   her FEV at 1.00 liters or 39% of the predicated volume.  AR 301,

2   303.  The specialist found that plaintiff's capacities were

3   consistent with "severe restrictive lung disease" and ordered

4   "urgent consultation with pediatric oncology."  AR 301.  UCSF

5   pediatric oncologist Elizabeth Robbins, MD, saw plaintiff a few

6   days later and noted that plaintiff had recently stopped smoking.

7   AR 298.  Dr Robbins also recommended a ten-week regiment of

8   chemotherapy if a pathology review confirmed the LCH diagnosis.  AR

9   298-99.

10        Beginning in late 2001, plaintiff regularly saw physician

11   Mark J Freeman, MD, for primary care.  AR 417-25.  Dr Freeman and

12   Dr Robbins delayed the planned course of chemotherapy in order to

13   try a three-month course of steroids.  AR 425.  Although this drug

14   improved her lung function, it did not improve plaintiff's feelings

15   of fatigue and it caused her to gain weight and develop acne.  AR

16   423-24.  In September 2002, plaintiff and her mother decided

17   plaintiff would not continue the steroid and would not begin

18   chemotherapy.  AR 420.  Although Dr Freeman noted that he wanted to

19   repeat the steroid "in a couple months" (id), the record contains

20   no reference to a repeat course of the steroids or a course of

21   chemotherapy.

22        The record includes several notations by Dr Freeman

23   encouraging plaintiff to be more active.  AR 275, 419, 420, 423.

24   In September 2002, Dr Freeman noted that while plaintiff complained

25   of fatigue and chest pain, she had "no trouble walking into the

26   office from the parking lot" and "she has no trouble walking around

27   the mall."  AR 420.  On May 24, 2003, Dr Freeman's report indicated

28   that plaintiff was "not really exerting herself.  She does not run.

4

She says if she does any kind of exercise she pays for it with aches and pain for a few days." AR 275. He noted, however, that plaintiff "does jump on the trampoline occasionally for 5-10 minutes." Id. In one of Dr Freeman's last reports in the record, he remarked that although plaintiff was not consistently using her inhaler or exercising as much as Dr Freeman wanted, her LCH seemed to be "relatively stable." Id.

In April 2004, plaintiff went to an emergency room for an upper respiratory infection, AR 307, and a chest x-ray showed some relapse in the improvements her lungs had made in the previous year. AR 279.

In mid-2004, plaintiff returned to Dr Robbins to obtain medical clearance for a vacation to the Bahamas sponsored by Make-A-Wish Foundation. AR 482, 286. Dr Robbins wrote that plaintiff "had LCH of the lungs in 2000 and 2001," and that she presently had "residual pulmonary dysfunction from pulmonary involvement of histocytosis." AR 286. Dr Robbins also noted that plaintiff "has been stable since her last visit to UCSF in December of 2001," and that she did not currently have "any symptoms to suggest active histocytosis." Id.

In 2004, plaintiff began regularly seeing family physician Kimberly Fordham MD, who ordered plaintiff to undergo cardiology testing. AR 317. In September 2004, a two-hour test of heart activity using a Holter monitor revealed no significant irregularities. Id.

In October 2004, plaintiff saw pulmonary specialist Paul J Marks, MD, for examinations requested by Dr Fordham. AR 323. Plaintiff told Dr Marks that she had begun smoking when she was

United States District Court
For the Northern District of California

twelve or thirteen and smoked approximately one-half pack per day of cigarettes for two or three years.  AR 325.  After examining plaintiff and her records, Dr Marks recorded that plaintiff "feels well" and "is not having any respiratory difficulties," indicating also that plaintiff's LCH had "improved after she quit smoking in 2001, and her symptoms have been stable since that time."  AR 323.

At a checkup with Dr Fordham in April 2005, plaintiff complained of shortness of breath, abdominal pain, heart palpitations, eye strain that was producing headaches, and pain in her wrist and lower back.  AR 349.  Dr Fordham ordered chest and back x-rays, neither of which found any irregularities.  AR 357, 356.

In March 2005, plaintiff underwent follow-up pulmonary testing which measured her FVC at 2.73 liters or 102% of the predicted volume and her FEV at 2.18 liters or 91% of the predicted volume.  AR 353.  The technician noted that plaintiff's "effort was erratic" (AR 355), and the interpreting physician remarked that this exam showed that plaintiff had "minimal obstructive airway disease."  AR 352.

On May 4, 2005, Dr Fordham noted that plaintiff's LCH was stable and that plaintiff had no shortness of breath, but diagnosed her with a probable upper respiratory infection.  AR 348.

On July 22, 2005, plaintiff visited Dr Fordham's office for continuing chest congestion.  AR 347.  The examining physician indicated that because of her LCH, plaintiff "is probably at higher risk for developing pneumonia."  Id.

On October 19, 2005, plaintiff visited Dr Fordham complaining about weight gain and an irregular heartbeat.  AR 346.

Dr Fordham noted that plaintiff's weight had been stable for the last six months and that she was attending a physical fitness program.  AR 346.

During an April 29, 2006 appointment, Dr Fordham noted that plaintiff was concerned that "since turning 18 she no longer has her disability, and she states that she is unable to work as she has many days where it is simply too difficult for her to get up in the morning, she is shaky and lightheaded, she has nocturia every hour at night, she has a fuzzy memory, and she overall does not feel like she would be adequately fit for the workforce.  She is wondering how we can go about getting her on long-term disability."  AR 343.  Nocturia is the urge to urinate at night. In a March 29, 2006 letter "to whom it may concern," Dr Fordham wrote:

> [Plaintiff] still feels incapable of holding down gainful employment due to fluctuation of her symptoms with [LCH].  She quite frequently has chest tightness with shortness of breath and a persistent cough.  She also develops occasional characteristic rashes. Finally she has difficulty sleeping at night due to her shortness of breath and nocturia, which then contributes to her forgetfulness and diminished concentration during the daytime. * * * [LCH] is a progressive disease that quite likely does render her incapable of holding down gainful employment at any point during her life and also can affect her immune system, which therefore should limit her exposure to the general populous [sic].  I feel that it is warranted to put her on disability.

AR 340.

Ophthalmologist Timothy L Young, MD, examined plaintiff in May 2006.  Dr Young diagnosed plaintiff as "glaucoma suspect" because of her "high cup-disc ratio" and her family history, but stated that plaintiff's prognosis was "quite good" with no progressive loss of vision.  AR 359-60.

United States District Court
For the Northern District of California

The final medical note in the record documents plaintiff's appointment with Dr Fordham on October 23, 2006 for jaw pain.  AR 441.  Dr Fordham wrote:  "[Plaintiff] has intermittent shortness of breath episodes and does not know which days she will be able to go out and about her regular activities versus feeling too short of breath which requires her to stay home.  She is concerned that she was disqualified for SSI."  Id.

B

On October 21, 2001, plaintiff applied for SSI benefits under Title XVI of the Social Security Act.  AR 17.  In December 2001, SSA determined that plaintiff's LCH medically equaled the listing level for chronic pulmonary insufficiency under disability listing level 103.02A which qualified plaintiff for disability benefits until her eighteenth birthday in June 2004.  AR 17, 25, 375-78; 20 CFR Pt 404, Subpt P, App I.

In July 2004, after reviewing plaintiff's medical history and conducting a physical residual functional capacity (RFC) assessment, physician consultant David Pong, MD, determined that plaintiff "should be able to do at least sedentary" work, and concluded it was "appropriate to cease" her disability benefits.  AR 315.  In August 2004, the SSA redetermined plaintiff as not disabled for purposes of SSI.  AR 17.

In June 2004, plaintiff filed an application for disabled adult child benefits under Title II of the Social Security Act.  AR 17, 110.  The SSA also denied this claim in August 2004.  AR 17, 30.

\\

8

United States District Court

For the Northern District of California

1    On September 30, 2004, plaintiff filed a request for

2    reconsideration of both denials.  AR 17.  On November 23, 2004,

3    physician consultant George Jansen, MD, reexamined plaintiff's

4    medical records and concurred with Dr Pong's previous determination

5    that plaintiff was capable of sedentary work.  AR 330.

6    A hearing officer heard plaintiff's claims in a

7    consolidated hearing and denied benefits on January 3, 2005.  AR

8    17, 53.  The hearing officer found that while plaintiff did have a

9    "loss of pulmonary function" which impacted her functioning,

10   plaintiff was not credible and "her reported symptom severity [was]

11   not supported by the objective medical findings."  AR 59.

12   On January 27, 2005, plaintiff requested a hearing before

13   an ALJ.  AR 17, 65.  The hearing initially began on December 15,

14   2005, but was postponed to allow plaintiff time to obtain counsel.

15   AR 17, 450, 457-61.  After plaintiff's effort to retain counsel

16   proved fruitless, the hearing took place on March 7, 2006.  AR 17,

17   462.

18   During the hearing, UCLA cardiovascular and pulmonary

19   specialist Paul J Grodan, MD, testified as a medical expert (ME).

20   He testified about the potential courses of LCH:  "One common

21   course is that it goes into remission and more or less disappears,

22   it has a benign outcome.  The other outcome it is a progressive

23   disease.  And based on [plaintiff's] course, considering that since

24   2001 she has improved, I suspect she has the benign form of the

25   disease."  AR 92, 475.  Dr Grodan similarly remarked, "considering

26   her course since 2001, I would say she was able to get over it.

27   * * * There's nothing that would even approach the [disability]

28   listing."  AR 476.  Dr Grodan agreed that plaintiff had a reduction

United States District Court
For the Northern District of California

in her lung capacity, but thought that "she could probably do more than sedentary work."  Id.  "[G]iving her the benefit of the doubt," he agreed with the previous opinions that plaintiff was capable of sedentary work.  AR 477.

In response to plaintiff's testimony that she had glaucoma and felt pressure in her eyes, AR 469-70, Dr Grodin explained that glaucoma does not cause perceptible pressure in the eyes and is a treatable condition.  AR 477.

Dr Grodan also criticized Dr Fordham's April 29, 2006 letter characterizing plaintiff as unable to work, stating the letter was "not relevant, because [plaintiff] doesn't seem to be immune impaired," and characterizing Dr Fordham's letter as trying to "fortify [plaintiff's] position with statements that are not exactly applicable to her position."  AR 476.

When asked if she had any questions for Dr Grodan, plaintiff expressed disagreement with Dr Grodan's characterization of her LCH.  Specifically responding to Dr Grodan's statement that she had no serious immune deficiencies, plaintiff claimed that she saw Dr Fordham "like every month for a cold, because I get them very easily.  They keep me on antibiotics all the time."  AR 478.  She continued, "while [LCH] may have affected my lungs at the time, it's not something that goes away, it affects the whole body.  It caused my heart to have an oversized valve from the no oxygen running through my veins.  It causes bone pain.  It's caused everything."  AR 480.  After plaintiff had expressed this, the ALJ asked Dr Grodan if plaintiff's record contained any evidence of heart problems or whether LCH was associated with causing bone pain, to which Dr Grodan simply replied "no."  AR 480-81.

**United States District Court**
For the Northern District of California

Plaintiff testified that Dr Robbins told her she should not be around chemicals and that she should not be around people because she was more susceptible to illnesses. AR 487. She stated that her only work experience was a one-month job at Subway, which she left because she could not be around the cleaning chemicals and she was too tired. AR 486. When asked if she had thought about other jobs, plaintiff responded that she had, but said "during the day I sleep too much, there's no way I could hold down a job that makes me up [sic] during the day or during the night." AR 487. Plaintiff noted, "some days I'm better, my whole body, some days I'm not. Like my eyes, some days my eyes are very sensitive to light, can't even go outside." AR 488.

The ALJ probed plaintiff's daily routine, but plaintiff persistently denied involvement in virtually any activity. Plaintiff claimed never to do any house-cleaning, cooking, washing of dishes, food preparation or laundry. AR 491-93. She also claimed never to feed or walk the family dog and never to engage in any sort of evening entertainment with her boyfriend. AR 493-94. She claimed to do nothing except watch television, sleep and occasionally try to clean her room and accompany her boyfriend's mother to the grocery store. AR 491-94.

Plaintiff testified that her daytime somnolence was due to "chronic fatigue." AR 488. The ALJ asked whether she had a diagnosis of chronic fatigue, to which she replied, "well I've —— they've never diagnosed me, so I'm guessing." AR 488.

The ALJ asked vocational expert Malcolm Brodzinsky, PhD, to testify about the sedentary jobs available to a person with plaintiff's age, education, and background and with limitations on

**United States District Court**
For the Northern District of California

exposure to dusts, fumes, chemicals and people.  AR 499.  Dr
Brodzinsky identified several jobs for which this hypothetical
person would be qualified, including a final assembler of optical
goods, a jewelry stone setter, or a telephone quotation clerk, all
of which exist in significant numbers in the regional and national
economy.  AR 499-500.  The ALJ then asked Dr Brodzinsky whether
that same person would be employable if she missed work three times
per month.  AR 500-01.  Dr Brodzinsky believed that more than three
absences per month would render her unemployable.  AR 501.

On September 22, 2006, the ALJ denied plaintiff's request
for benefits.  AR 17-25.  The ALJ found that plaintiff had "severe"
medical impairments, but that these impairments did not meet or
equal a listed impairment —— presumably, the listing for chronic
obstructive pulmonary disease, which is indicated by a FEV equal to
or less than 1.05 liters for a person of plaintiff's height.  AR
22; 20 CFR Pt 404 Subpt P, App 1, 3.02A.  The ALJ found that
plaintiff had the RFC for "sedentary work with no exposure to
fumes, odors, dusts, gases, chemicals, and poor ventilation and
minimal contact with the public."  AR 24.  The ALJ found that
plaintiff had no past substantial gainful work experience, but
treated the job at Subway as "past relevant work" for purposes of
step four and found that her RFC would prevent her from being a
fast food worker.  AR 25.  The ALJ did not find, however, that
plaintiff was "precluded from all work," specifically finding that
plaintiff was capable of certain unskilled sedentary with limited
public contact, i e final assembler of optical goods, stone setter
and telephone quotation clerk.  AR 22.

\\

**United States District Court**
For the Northern District of California

1    The ALJ specifically set forth multiple reasons why he
2    found plaintiff's credibility to be "poor."  AR 23.  Plaintiff
3    "testified that she has glaucoma, but her treating ophthalmologist
4    Dr Young diagnosed her as a 'glaucoma suspect.'"  AR 22.  "She
5    claims that she has vision problems," but "the ME testified [that
6    glaucoma] does not cause significant symptoms until the very
7    advanced stages."  Id.  The ALJ noted that plaintiff "incredibly
8    claims that she does absolutely nothing and never leaves the mobile
9    home."  AR 23.  Although the ALJ did not elaborate, his disbelief
10   is supported by the record.  AR 420 (Dr Freeman noted in 2002 that
11   plaintiff "has no trouble walking around the mall"); AR 275 (Dr
12   Freeman noted in 2003 that plaintiff jumped on a trampoline); AR
13   346 (Dr Fordham noted in 2005 that plaintiff attended a physical
14   fitness program).  In addition to these several inconsistencies,
15   the ALJ noted that plaintiff had made "no effort to seek work
16   within her RFC since she stopped working at Subway," perhaps
17   implying that plaintiff's lack of motivation, not her alleged
18   impairments, was the true reason for her lack of work experience.
19   AR 23.

20   The ALJ also stated his reasons for discounting Dr
21   Fordham's claims about the severity of plaintiff's LCH.  The ALJ
22   found Dr Fordham's claims contradicted by the findings of
23   specialists Drs Marks, Grodan and Young and noted that Dr Fordham's
24   own treating records "do not support her conclusion."  Id.  "The
25   treating evidence from Dr Fordham refers to [plaintiff's] pursuit
26   of disability benefits, rather than seeking treatment."  Id.

27   The ALJ found that plaintiff had the capacity "for
28   sedentary work with no exposure to fumes, odors, dusts, gases,

**United States District Court**

For the Northern District of California

chemicals and poor ventilation and minimal contact with public," of which significant numbers of jobs exist.  Id.  On that basis, he found plaintiff "no longer disabled" for purposes of SSI and "not disabled as an adult child under Title II."  AR 24.

On October 22, 2006, counsel represented plaintiff in requesting review of the ALJ's decision by the appeals council.  AR 401, 405.  Dr Fordham submitted a statement on plaintiff's behalf to the appeals council stating that plaintiff "is very fatigued all the time & frequently short of breath so unable to hold gainful employment with consistency."  AR 410.  On August 15, 2007, finding "no reason under [its] rules to review the ALJ's decision," the appeals council denied plaintiff's request, thereby making the ALJ's decision the final decision of the SSA.  AR 8.

On October 3, 2007, plaintiff timely commenced the instant action.  Doc #1.

II

The court's review of an ALJ's decision is limited to determining whether it is supported by substantial evidence and correct legal principles.  Thomas v Barnhart, 278 F3d 947, 954 (9th Cir 2002).  "Substantial evidence" is "more than a mere scintilla but less than a preponderance"; it is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  Id.  Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ.  Andrews v Shalala, 53 F3d 1035, 1039 (9th Cir 1995).

\\

United States District Court

For the Northern District of California

1    An adult may qualify for SSI if afflicted with a

2    "medically determinable physical or mental impairment * * * of such

3    severity that he is not only unable to do his previous work but

4    cannot, considering his age, education, and work experience, engage

5    in any other kind of substantial gainful work which * * * exists in

6    significant numbers."  42 USC § 1382c(a)(3)(A)-(B).  Title II

7    entitles certain persons between eighteen and twenty-two to

8    benefits if they are "disabled" under the same standard.  Id at

9    § 402(d).

10    SSA regulations instruct the ALJ to conduct a five-step

11    analysis to determine:  (i) whether the claimant is currently

12    engaged in substantial gainful activity; (ii) if not, whether the

13    claimant has a "severe" medically determinable impairment; (iii) if

14    so, whether that medical impairment meets or equals a SSA

15    disability listing level; (iv) if not, whether the claimant's RFC

16    makes her incapable of doing her past relevant work; and, if not,

17    (v) whether, considering the claimant's RFC, age, education and

18    work experience, she is incapable of doing other work.  20 CFR

19    § 404.1520(a)(4)(i)-(v); 20 CFR § 416.920(a)(4)(i)-(v).

20    In the instant action, the ALJ completed all five steps,

21    finding plaintiff "not disabled" at step five and able to perform

22    sedentary work with restrictions against exposure to dust or fumes

23    and limited public contact.  AR 22-24.

24

25    III

26    Plaintiff contends that the ALJ erred by:  (1) improperly

27    denying plaintiff due process by failing to follow SSA procedures

28    relating to the introduction of new evidence and failing to notify

15

plaintiff of her rights regarding that evidence; (2) improperly discounting evidence from plaintiff's treating physician which supported a disability finding; (3) improperly finding that plaintiff's disease was in remission and that plaintiff had made a complete recovery; and (4) improperly discounting plaintiff's credibility.  Doc #13 at 7-8, 9-10, 8-9, 10-12.

A

Plaintiff first accuses the ALJ of a number of procedural missteps.  She asserts that the ALJ "failed to notify [her] of her right to request a supplemental hearing with the opportunity to further develop the medical expert's opinion as the later received evidence."  Id at 7.

The hearings, appeals and litigation law manual (HALLEX) is an internal SSA manual that "defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, appeals council and civil actions levels."  HALLEX I-1-0-1.  Because the HALLEX is "not published in the Federal Register or the Code of Federal Regulations," it does not "carry the force and effect of law."  Lowry v Barnhart, 329 F3d 1019, 1023-24 (9th Cir 2003).  Nevertheless, ALJs are expected to follow HALLEX.  Doc #14 at 4.

Plaintiff claims, confusingly, that the ALJ failed to follow HALLEX I-2-7-30, which requires plaintiff to be notified of her right to challenge newly introduced evidence.  Doc #13 at 7. But the ALJ sent precisely such a notice to plaintiff in a May 16, 2006 letter, notifying her that he was entering exhibits 15F (Dr Fordham's letter) and 16F (records from Dr Young) into the record

16

**United States District Court**

For the Northern District of California

and specifically notifying her of her rights.  AR 209-10.  That letter informed plaintiff she could submit comments or questions about the evidence or request a supplemental hearing.  AR 209. Plaintiff fails to articulate in what way the ALJ's action was deficient.  Plaintiff also does not explain how the admission of this evidence harmed her.  On the contrary, she appears to rely on each of these documents.  Doc #13 at 5-7.

For reasons unclear, plaintiff also cites HALLEX I-2-5-44, which states:  "When the ALJ receives a ME's response to his or her interrogatories, the ALJ must" notify the claimant of her right to "comment, submit further relevant evidence, propose additional interrogatories to the ME, and request a supplemental hearing with opportunity to question the medical expert at the supplemental hearing."  No interrogatories were propounded in this case, however, and, moreover, plaintiff was given an opportunity to challenge the ME's testimony.  Plaintiff in fact availed herself of this opportunity to express disagreement with him.  AR 478-82.

Plaintiff was properly notified of her rights relating to the introduction of new evidence, this notification was consistent with established SSA notification procedures and there is no indication that plaintiff was prejudiced by the introduction of this evidence.  Accordingly, the court finds no error was committed with respect to informing plaintiff of her procedural rights related to new evidence.

**B**

Next, plaintiff claims the ALJ improperly discounted treating physician Dr Fordham's opinions.  Doc #13 at 9.  Plaintiff

17

1    specifically claims that the ALJ failed to apply SSA regulations

2    regarding the weighing of treating physicians' opinions.  Id.

3              Twenty CFR sections 404.1527 and 416.927 govern the

4    weighing of medical opinions.  They require the ALJ to give

5    controlling weight to a treating physician's opinion that is "well-

6    supported by medically acceptable clinical and laboratory

7    diagnostic techniques and is not inconsistent with the other

8    substantial evidence."  20 CFR § 404.1527(d)(2); 20 CFR §

9    416.927(d)(2).  Even if not giving the opinion controlling weight,

10   the ALJ must weigh the treating physician's opinion according to

11   the factors set forth in the regulations:  (i) the length of the

12   treating relationship and the frequency of examinations, (ii) the

13   nature and extent of the physician's treatment relationship and

14   (iii) the objective support for the opinion in terms of medical

15   signs and laboratory findings.  20 CFR § 404.1527(d)(2)(i),

16   (d)(2)(ii), (d)(3); 20 CFR § 416.927(d)(2)(i), (d)(2)(ii), (d)(3).

17   In addition to these provisions cited by plaintiff, the regulations

18   also direct the ALJ to consider:  (iv) the opinion's consistency

19   with the entire record and (v) the physician's speciality.  20 CFR

20   § 404.1527(d)(4), (5); 20 CFR § 416.927(d)(4), (5).  Finally, the

21   regulations instruct the ALJ not to credit physician opinions on

22   issues reserved for determination by the SSA, such as whether one

23   is "disabled" or "unable to work."  20 CFR § 404.1527(e)(1); 20 CFR

24   § 416.927(e)(1).  Plaintiff asserts that the ALJ failed to follow

25   these regulations because the "decision is silent" as to these

26   factors with respect to Dr Fordham's opinions.  Doc #13 at 9.

27             The ALJ's decision specifically cites several problems

28   with Dr Fordham's opinions.  Much of the March 29, 2006 letter (see

**United States District Court**
For the Northern District of California

AR 340) expressed opinions on topics reserved for the SSA's determination.  AR 23.  The regulations allow the ALJ to disregard Dr Fordham's conclusions that LCH prevents plaintiff from "holding down gainful employment" and that plaintiff should be placed on disability.  20 CFR § 404.1527(e)(1); 20 CFR § 416.927(e)(1); AR 340.  This regulation supports the ALJ's statement that the letter "is not a medical source statement addressing functional capacity, but rather appears to be for the sole purpose of supporting [plaintiff's] SSI claim."  AR 23.

The ALJ also properly discounted Dr Fordham's opinions about the severity of plaintiff's LCH.  Dr Fordham wrote that LCH is a progressive disease that affects plaintiff's immune system and contributes to many other problems.  AR 340.  Dr Fordham, however, is not a specialist in a field relating to LCH and has no special expertise or experience with the disease.  Dr Grodan, a cardiovascular and pulmonary specialist, disagreed with Dr Fordham's remarks, stating that Dr Fordham's opinion was "not relevant, because [plaintiff] doesn't seem to be immune impaired. * * * She didn't have bad flu syndrome that would cause hospitalization."  AR 476.  At the ALJ hearing, the ME agreed that in theory the disease could affect plaintiff's immune system, but he concurred with the ALJ that plaintiff's disease had not "progressed to that degree, fortunately."  AR 476-81.  The ALJ's finding that plaintiff's disease had not progressed to that level is consistent with the record of treating physician Dr Freeman, who stated in 2003 that plaintiff's LCH was stable, AR 275, and with pulmonary specialist Dr Marks, who stated that plaintiff's disease had been stable since 2001, AR 323, and with pediatric oncology

**United States District Court**

For the Northern District of California

1  specialist Dr Robbins, who stated in 2004 that plaintiff does not

2  have "any symptoms to suggest active histocytosis."  AR 286.

3        The ALJ also pointed out that Dr Fordham's own records

4  undercut her assertions about the severity of plaintiff's LCH.  AR

5  23.  In 2004, Dr Fordham remarked that plaintiff "feels well, and

6  is not having any respiratory difficulties," AR 323, and she

7  remarked in 2005 that plaintiff's LCH "appears stable."  AR 348.

8  The ALJ was entitled to give more weight to the opinions that were

9  more supportable by objective evidence, were more consistent with

10  the record as a whole and/or were given by specialists.  20 CFR

11  § 404.1527(d)(3), (d)(4), (d)(5); 20 CFR § 416.927(d)(3), (d)(4),

12  (d)(5).

13        The ALJ's discounting of treating physician Dr Fordham's

14  opinions was therefore proper.  The court does not require the ALJ

15  to discuss systematically each factor in the regulations in

16  checklist fashion.  Instead, the factors should merely guide the

17  ALJ's discussion and properly did so in this case.  When a treating

18  physician's opinion is contradicted and a non-treating source's

19  opinion is based on independent clinical findings differing from

20  the treating physician's, the non-treating source's opinion may

21  constitute substantial evidence to support the ALJ's findings.

22  <u>Morgan v Commissioner</u>, 169 F3d 595, 600 (9th Cir 1999).  Thus, the

23  ALJ did not error in discounting Dr Fordham's opinion and the

24  contrary finding that plaintiff was not severely affected by active

25  LCH was supported by substantial evidence.

26  \\

27  \\

28  \\

C

In his findings, the ALJ stated:  "Pulmonary specialist Dr Marks and the medical expert Dr Grodan (cardiologist) find that claimant has had complete recovery and remission from LCH."  AR 23. Plaintiff challenges this statement as without support and prejudicial.  Doc #13 at 8.

Dr Grodan testified that LCH may be either a progressive disease or may go into remission and that he believed plaintiff's LCH followed the latter path because her condition had improved since the onset of her disease in 2001.  AR 475.  Presumably, Dr Grodan based this conclusion on the record evidence including statements from Drs Freeman, Marks, Robbins and Fordham that plaintiff's LCH was stable and had improved since 2001 after she stopped smoking.  AR 275, 286, 323, 348.  The other symptoms of which plaintiff complained —— heart problems, back pain, severe immune deficiencies, glaucoma —— are similarly unsupported by objective medical evidence.  AR 357 (chest x-ray found no problems in 2005), 356 (back x-ray found no problems in 2005), 476 (Dr Grodan found no evidence of severe immune deficiency), 359-60 (Dr Young found no serious non-treatable eye problems).  Moreover, plaintiff's most recent spirogram measured her FVC at 2.73 liters and her FEV at 2.18 liters, or 102% and 91%, respectively, of plaintiff's predicted volume given her age, height and weight.  AR 353.  By contrast, the SSA disability listing level for chronic obstructive pulmonary disease for someone of plaintiff's height requires a FEV of 1.05 liters or less and chronic restrictive ventilatory disease requires FVC of 1.25 liters or less.  20 CFR Pt 404, Subpt P, App 1, 3.02A, 3.02B.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

While the ALJ's finding that plaintiff had made a "complete recovery" was perhaps an overstatement, it was immaterial to the ALJ's finding that plaintiff was capable of sedentary work. Indeed, the SSA physician consultants concluded that plaintiff was capable of sedentary work despite her LCH; the two findings are not inconsistent. AR 315, 330. The finding's erroneous language, if any, is immaterial and therefore harmless. Curry v Sullivan, 925 F2d 1127, 1131 (9th Cir 1990).

Accordingly, substantial evidence supports the ALJ's finding that plaintiff's LCH was in remission and any imprecision in the phrasing of the finding that plaintiff had made a complete recovery does not warrant remand.


D

Finally, plaintiff challenges the ALJ's determination that she is not credible. She asserts, vaguely, that the ALJ has failed to follow the regulation guidelines in 20 CFR §§ 404.1529 and 416.929 for determining the credibility of subjective symptoms. Doc #13 at 10-12.

Sections 404.1529 and 416.929 provide that if objective medical evidence supports the existence of an underlying impairment, the SSA may not discredit claims of subjective symptoms merely because they are unsupported by objective evidence. Lester v Chater, 81 F3d 821, 834 (9th Cir 1996). The SSA may, however, discredit claims of subjective symptoms if it has "clear and convincing" reasons for doing so. Id. The ALJ as fact-finder is solely responsible for weighing and drawing inferences from facts and determining credibility, Allen v Heckler, 749 F2d 577, 579 (9th

**United States District Court**
For the Northern District of California

Cir 1984), and the court will defer to the ALJ's credibility
determinations when they are appropriately supported in the record
by "specific findings justifying that decision." Cotton v Bowen,
799 F2d 1403, 1407 (9th Cir 1986).

The ALJ granted that plaintiff had "medically
determinable impairments that could reasonably be expected to
produce her symptoms," AR 22, but went on to state that plaintiff's
"credibility is poor." AR 23. He then devoted three paragraphs to
explaining why he discounted plaintiff's subjective statement. Id.
The court finds the ALJ's reasons to be "clear and convincing."
See Lester, 81 F3d at 834.

Plaintiff's claims are not merely unsupported by
objective evidence, they are often contradicted by the record.
Plaintiff's exaggerations, assertions contradicted by the record
and other conduct justifying skepticism about plaintiff's
subjective claims are summarized in section I. The ALJ
specifically cited plaintiff's assertion that she has glaucoma (see
AR 469-70), which was contradicted by Dr Young (see AR 359) and her
related testimony that she has vision problems and feels pressure
in her eyes (see AR 469-70), which was contradicted by the ME (see
AR 477). AR 22-23. Dr Young's report (see AR 359) also
contradicts plaintiff's claim that some days she has to stay inside
because of her eyes (see AR 488). During the hearing, the ALJ also
challenged plaintiff's unsupported statement that she had "chronic
fatigue." AR 488.

While the ALJ was justified in discounting many of
plaintiff's claims, he did credit her some limitations. Even
accounting for plaintiff's assertedly deficient immune system by

23

**United States District Court**
For the Northern District of California

limiting her to jobs with little public interaction and recognizing her sedentary and clean-air limitations, the vocational expert still found plaintiff capable of performing several jobs. AR 499-500. Although the ALJ found that plaintiff has impairments, he found these impairments not so substantial as to render her incapable of employment. The ALJ's decision must be upheld if the evidence is "susceptible to more than one rational interpretation." <u>Thomas</u>, 278 F3d at 954.

Accordingly, the ALJ committed no error in discrediting plaintiff's credibility.

IV

For the above reasons, the court finds plaintiff's challenge to the SSA's decision to be without merit. The court believes that plaintiff's best long-term course is to make the most of her abilities by pursuing substantial gainful employment and a rewarding career. Plaintiff's motion for summary judgment is DENIED and defendant' cross motion for summary judgment is GRANTED.

The clerk is directed to close the file and terminate all pending motions.

IT IS SO ORDERED.


_____
VAUGHN R WALKER
United States District Chief Judge